IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:05cr110-F |
| | ) | WO |
| FREDRICK TYRONE DAVIS | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant's motion to suppress (Doc # 21), his motion for leave to file motion outside of time (Doc. #41), and his motion to admit CD with audio recording and offer of proof (Doc. # 40).   For the reasons discussed below, the court concludes that Doc. # 41 should be granted, and that the remaining motions are due to be denied.

Facts

Mark Harrell, a narcotics investigator for the Prattville, Alabama Police Department, received information from a confidential informant ("CI") that the informant could purchase crack cocaine from the defendant, Fredrick Davis.   Prior to receiving this information, Harrell had learned from another informant that Davis "is slinging a lot of dope," and "if you get him you will get a big one."   A third informant had indicated to Harrell that Davis possessed crack cocaine.   On October 29, 2004, the CI set up a controlled purchase at defendant's residence during a recorded telephone conversation.   After police searched the CI and his vehicle, the CI met the defendant and purchased a quantity of crack cocaine from him.   The controlled buy was recorded by means of an audio recording device.

Thereafter, the CI successfully made at least two other purchases of narcotics from

other sellers. Harrell found that the information given by the CI was "very reliable," that he "never exaggerated" the information provided, and that, with regard to defendant, "[p]retty much everything that he told me I could corroborate from other investigators and other informants that had gotten information on Mr. Davis."

On December 7, 2004, at Harrell's request, the CI set up another controlled buy with defendant by telephone, traveled to defendant's residence, and purchased another quantity of crack cocaine. The CI again made audio recordings of the telephone call and the drug buy. Thereafter, Harrell discussed two possible approaches to the investigation with Sergeant David Harrell: either seeking a search warrant, or stopping Davis and asking him to be an informant. Due to other investigations and the holidays, no decision was made as to how to proceed at that time. However, Harrell prepared arrest warrants relating to both of the controlled buys for his file.

On January 28, 2005, DEA task force agent Raymond DeJohn received a call from Investigator Bruce Little of the Prattville Police Department indicating that Little had just seen defendant at an intersection in Prattville. Little and DeJohn had talked on several previous occasions about defendant's drug activities. Little decided to follow defendant to see where he was going. When it appeared that defendant was heading to Montgomery, DeJohn left his office there to see if he could intercept the defendant and find out where he was heading in Montgomery.

DeJohn located defendant's Chevrolet Suburban and followed it to a house in Montgomery. DeJohn observed what appeared to him to be drug activity at this location.

When Davis left, DeJohn and Little followed defendant back to Prattville.  They got in contact with Sgt. Williams, who apparently advised a Prattville police officer, Lieutenant Barlow, that Davis was on his way back to Prattville, that drug investigators were following his car, and that "at some point we may need a vehicle to conduct a traffic stop."  DeJohn and Little followed defendant to Prattville, where he turned on McQueen Smith Road.  Barlow's patrol car was ahead of DeJohn's vehicle, and either directly behind or one car behind defendant.  DeJohn and Little told Barlow on the radio that "[i]f there was a reason to stop [Davis], if he commits some sort of traffic violation or whatever, if you have probable cause to stop him, you know, go ahead and stop him if you find it."  Shortly thereafter, Barlow radioed DeJohn that Davis had failed to use a turn signal, and he was going to conduct a traffic stop.

After Barlow stopped the defendant and was running his driver's license, Barlow received a call from Sgt. Williams asking him if he were with Fredrick Davis, and indicating that Williams wanted to speak with him and was on his way there, right around the corner. A couple of minutes after Barlow stopped Davis, DeJohn and Williams arrived at the scene, where Barlow was writing a citation for the traffic violation.  They introduced themselves to Davis and advised him that they wanted to talk to him.  Davis consented to speak with the officers, who told him that he was under investigation and that they had two drug distributions that he was going to be arrested for.  The officers asked whether Davis wanted to cooperate with law enforcement.  Davis said that he had nothing to say to the officers, and walked away from them and toward his vehicle.  The officers told him to stop, that he was

under arrest.  Defendant got into his vehicle, and they repeated the command to stop.

Thereafter, DeJohn and Little placed Davis under arrest for two counts of unlawful distribution of a controlled substance based on the October and December controlled buys. He was handcuffed and put in the back of a patrol car.  DeJohn knew at the time of Davis' arrests that the City of Prattville was seeking warrants for Davis' arrest, but did not know whether the warrants had been signed or not at the time of the arrest.  The government concedes that the warrants were not, in fact, signed prior to the arrest.  Sergeant Williams did tell Harrell to get to his office, get the arrest warrants that he had already prepared on defendant, get them signed, and meet them at the courthouse.  Harrell complied, but the arrest warrants were not served on defendant until after DeJohn and Little had already arrested him at the traffic stop.

After Davis was arrested, Barlow used his drug dog to search the interior and exterior of Davis' vehicle.  The dog alerted to the presence of narcotics in the dashboard area around one of the air vents.  The officers saw a clear plastic bag containing approximately a half ounce of crack cocaine inside the air vent.  The area was photographed, and the drugs were later recovered.  After the vehicle was impounded, Harrell conducted an inventory search and found and seized a 9mm Hi-Point pistol under the hood of the vehicle in a storage compartment.

Later, DeJohn and Harrell went to the county jail to try to interview Davis.  They advised him of his rights, and Davis began to talk about some individuals he had been involved with in the past, but said that he was no longer dealing with them.  He told the

officers that the gun was not his, although he knew it was there.  When asked to explain why

his fingerprints were on the weapon, Davis said that he might have moved it around.  He

denied possession of the drugs found in the vehicle.

Discussion

1.      Controlled buys

Defendant contends, with regard to the October 29, 2004 and December 7, 2004

controlled buys, that "[u]nder the 'totality of the circumstances' test in Gates v. Illinois, 462

U.S. 213 (1983), the confidential-informant information is constitutionally insufficient under

the Fourth Amendment to provide probable cause to effect the informant intrusion and

subsequent arrest of Davis." Motion to Suppress at 4.  However, the Gates test – which the

Supreme Court articulated in the context of a challenge to a search warrant – has been

applied primarily to searches and arrests.  See, e.g., United States v. Magluta, 418 F.3d 1166

(applying Gates to warrantless search); United States v. Jiminez, 224 F.3d 1243 (11th Cir.

2000) (applying Gates to search warrant); United States v. Gonzalez, 969 F.2d 999 (11th Cir.

1992) (applying Gates to warrantless arrest).  There is no constitutional requirement that the

government have probable cause to set up a controlled buy using a confidential informant.

Thus, to the extent that defendant seeks to use the Fourth Amendment to challenge the

controlled buys themselves, his argument is without merit.

2.      Pretextual Stop

Defendant contends that the traffic stop in this case was pretextual and without

probable cause.  Defendant's motion does not specifically state his view as to why he was

pulled over by Lt. Barlow, but he appears to believe that Barlow's motive was to search for drugs or otherwise to assist in the drug investigation, not to enforce traffic regulations. At the hearing, Barlow testified that he had never seen Davis before he pulled him over, and was not on the lookout for him or the car he was driving before the stop. However, Barlow did acknowledge that, earlier in the day, he had learned from either DeJohn or Williams that they had "received intelligence about Davis['] possibly being involved in drug activity."

DeJohn's testimony contradicted Barlow's account of the incident in part. DeJohn said that he believed that Sgt. Williams had advised Barlow prior to the traffic stop that Davis was on his way back to Prattville, that drug investigators were following his car, and that "at some point we may need a vehicle to conduct a traffic stop." DeJohn testified that when Davis turned on McQueen Smith Road, he and Williams were not quite sure whether they wanted to continue to follow him. As noted above, they told Barlow on the radio that "[i]f there was a reason to stop [Davis], if he commits some sort of traffic violation or whatever, if you have probable cause to stop him, you know, go ahead and stop him if you find it." Shortly thereafter, Barlow radioed DeJohn that Davis had failed to use a turn signal, and he was going to conduct a traffic stop. The court credits DeJohn's testimony in this regard, and finds that Barlow was on the lookout for Davis' vehicle in connection with the drug investigation, and was in fact following Davis' vehicle before the stop.

However, even if Barlow's actual motivation in stopping defendant was to find drugs or to assist in the investigation, it is clear that "ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred." Draper v.

Reynolds, 369 F.3d 1270, 1275 (11th Cir. 2004); see also Whren v. United States, 517 U.S. 806, 812-13(1996); United States v. Holloman, 113 F.3d 192, 194 (11th Cir.1997).  As the Eleventh Circuit has explained, "under Whren, the constitutional reasonableness of a traffic stop must be determined irrespective of intent, whether of the particular officer involved or of the theoretical reasonable officer."  Id. (internal quotation marks and citation omitted). Thus, so long as Barlow possessed probable cause to believe that defendant had committed a traffic violation, the stop complied with the Fourth Amendment regardless of any desire he may have had to intercept drugs.  Id.

In this case, Barlow testified that he stopped the defendant for failure to use a turn signal in violation of Ala. Code § 32-5A-133.  Barlow said that the defendant traveled northbound on McQueen Smith Road, came to a stop at the traffic light,[1] then made a right turn from his stopped position eastbound onto Highway 6 without using his turn signal.[2] Ala. Code § 32-5A-133 provides, *inter alia*, that:

> (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.

---

[1]  Barlow's initial testimony was that Davis came to a stop at the traffic light.  In response to further questioning, Barlow said that there was one vehicle in front of defendant when he stopped at the light.  According to Barlow, defendant made his right turn into the merge lane from behind that vehicle, not from the white stop line at the traffic light. Based on its understanding of the testimony and observation of the witnesses, the court finds that Barlow's testimony concerning the presence of a car in front of defendant's vehicle at the light constituted a clarification of his earlier testimony, not a contradiction.

[2]  Barlow indicated that the front of Davis' vehicle crossed some portion of the triangular area marked with white lines that divided the lane in which he initially stopped from the turn lane. However, Barlow ticketed Davis only for failing to signal the right turn.

> (b) A signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.

Ala. Code § 32-5A-133(a), (b).   Defendant argues that, because defendant came to a complete stop before turning right, he was not bound by the requirement of §32-5A-133(b) to signal continuously during not less than the last 100 feet he traveled before turning because he "did not travel a bit" before making the turn.   However, the court declines to adopt this over-technical reasoning.   Defendant did travel on the roadway before turning in two respects: he traveled down McQueen Smith Road before stopping, and then traveled into and along the merge lane before pulling out onto Highway 6.[3]   Defendant did not signal his turn during either movement, according to the uncontradicted testimony before the court. Thus, Barlow, who was in a position to view the vehicle in question, had probable cause to believe that defendant violated the plain requirement of Ala. Code § 32-5A-133 that a motorist must signal any turn on the roadway.[4]   If the court were to adopt defendant's interpretation, it would vitiate the statute by reading out of it any requirement to signal a turn so long as the driver came to a stop before turning – that is, at most intersections with traffic

---

[3]   Cf. United States v. One 1993 Ford F150 Pickup, 148 F.Supp.2d 1258, 1262-1263 (M. D. Ala. 2001) (Officer had probable cause to stop vehicle that moved into turn lane and completed turn without using right turn signal at any time, despite driver's claim that automobile merged rather than moved into turn lane, and no signal was required under Alabama traffic law.).

[4]   This requirement is set out in § 32-5A-133(a), which provides, *inter alia*, that no turn may be made without giving an appropriate signal.  Section 32-5A-133(b) describes the manner in which a turn should be signaled – that is, "continuously during not less than the last 100 feet traveled by the vehicle before turning" – but does not purport to limit the general requirement of § 32-5A-133(a) that a turn must be signaled.

signs or signals.[5]

Accordingly, the court concludes that the stop in this case was preceded by a traffic violation, and that it was justified by probable cause regardless of any other motivation that may have been present.  Thus, the traffic stop was lawful.

3.      Warrantless Arrest

Defendant contends that his arrest after the traffic stop violated the Constitution.  The government has conceded that the arrest warrants were signed after defendant was arrested at the scene of the traffic stop.  Thus, the court analyzes the arrest as a warrantless arrest.

"An arrest without a warrant is constitutionally valid if, at the moment the arrest was made, the officer had probable cause to make such an arrest."  United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992).[6]   "When the constitutional validity of an arrest is challenged, it is the function of the court to determine whether the facts available to the arresting officers at the moment of the arrest support a finding of probable cause."  Id. at 1349-1350 (11th Cir. 1992). "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested."  Id. at 1350.  "Where there is at least minimal

---

[5] The court notes that the cases defendant cited by defendant in oral argument do not alter this conclusion, or render the choice of whether or not to signal a turn under the current statute a matter of the motorist's discretion depending on the circumstances.

[6] Because Davis was arrested outside his home, the rule that a warrantless arrest inside the home of a suspect is presumptively unreasonable unless exigent circumstances justify the intrusion is not implicated in this case.  See Knight v. Jacobson, 300 F.3d 1272, 1277-1278 (11th Cir. 2002).

communication between different officers, the collective knowledge of the officers determines probable cause." Id. "While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough." Id.

In this case, DeJohn and Williams were the officers who arrested Davis. At the moment of the arrest, DeJohn knew quite a bit about Davis' activities. He had been investigating Davis "for some time" in connection with other individuals in Prattville. In conversations with Investigator Harrell, Sgt. Williams, and Investigator Bruce Little (an officer with the Prattville Police Department narcotics bureau), DeJohn had learned that the Prattville Police Department had made controlled purchases of drugs from Davis in October and December. He knew that police were proceeding on the day of the arrest to seek felony arrest warrants based on the October and December drug buys.

DeJohn also had information from police officers that Davis would often go into Montgomery during the daylight hours around 2:00 p.m. and get a "resupply" of cocaine. Around that time on the day of the arrest, DeJohn had followed Davis to a house in Montgomery, where he saw some activity that he believed was "consistent with drug activity." Specifically, DeJohn observed Davis as he parked his car at the house and went inside. Another vehicle with four males in it pulled up. One male got out, appeared to get something from the other individuals, and began to look around as he walked up to the house. Meanwhile, Davis left the house with something in this hands that he put in his pocket. He fumbled with his keys, then got in his car and drove away. As DeJohn circled around and passed the house again to catch up with Davis, he observed the male from the other car

10

coming out of the house.  When the individuals in the second car saw DeJohn coming back

by after he had been sitting still in his vehicle outside, "they began to panic," and DeJohn

observed that one of them looked like he "was fixing to take off running."

DeJohn's information, which the court concludes was reasonably trustworthy, was

clearly sufficient to give him probable cause to arrest Davis, particularly in light of his

knowledge that two controlled buys of drugs had previously been made from the defendant.

Accordingly, the court need not address the collective knowledge of the other officers

involved to determine whether DeJohn and Williams had probable cause to arrest.

4.      Warrantless Automobile Searches

When a policeman has made a lawful custodial arrest of the occupant of an

automobile, he may, as a contemporaneous incident of that arrest, search the passenger

compartment of that automobile. Thornton v. United States, __ U.S. __, 124 S.Ct. 2127,

2130-2131 (2004) (citing  New York v. Belton, 453 U.S. 454 (1981)).  There is no dispute

in this case that the officers' search of defendant's Suburban was contemporaneous with his

arrest.  Nor does defendant contend that the air vent in which the drugs were found is one

that could not be searched under Belton.  According to DeJohn, the vent "could just pop right

off.  I mean it was – had been removed looks like time and time again. It wasn't in there hard,

you just move it and it came right out."  In short, the vent was easily reachable by the

defendant, and no tools were required to dismantle it.  Thus, the air vent clearly constituted

an area in the passenger compartment within defendant's immediate control, into which he

might reach to obtain a weapon or destroy evidence. See United States v. Patrick, 3

11

F.Supp.2d 95, 99 (D. Mass. 1998). There was no constitutional error in this search.[7]

Later, after the Suburban was impounded, Harrell conducted an inventory search of the car and found the 9mm Hi-Point pistol covered in a shop rag in a storage compartment under the hood of the vehicle. "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987). "The policies behind the warrant requirement are not implicated in an inventory search, ... nor is the related concept of probable cause ... ." Id. A law enforcement officer may impound a vehicle "so long as the decision to impound is made on the basis of standard criteria and on the basis of 'something other than suspicion of evidence of criminal activity.' If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria. Because an inventory search is an exception to the Fourth Amendment's warrant requirement, however, the government officer has the burden to show that the requirements of the inventory search exception have been met." Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992).

In this case, defendant does not contend that the inventory search was based on suspicion of evidence of criminal activity, or that it was not conducted using standard

---

[7] In addition, a drug dog had alerted on the area, and the bag containing the cocaine appears to have been in plain view behind the vent – DeJohn testified that officers could see a clear plastic bag containing approximately a half ounce of crack cocaine inside the air vent. Further, the court finds that the contents of the bag inevitably would have been discovered in a routine inventory search. See United States v. Rhind, 289 F.3d 690, 694 (11th Cir. 2002); see also Michigan v. Thomas, 458 U.S. 259 (1982) (inventory search may include a search of a vehicle's air vents).

criteria.  Harrell testified that it was part of his duties to conduct the inventory search.  He determined that it was necessary to search the vehicle because "fairly expensive equipment was inside the vehicle, TVs and radio and stuff," and an inventory search would ensure that "if anything ever come up missing, broken into, that we would have an account of what was missing." Based on this testimony, the court concludes that the requirements of the inventory search exception have been met.

5.     Statements

Defendant contends that all statements made by defendant should be suppressed. However, there is no evidence before the court that defendant's statements were not knowing and voluntary.  It is undisputed that defendant received Miranda warnings before he made the statements in question.  See Dickerson v. U.S., 530 U.S. 428, 435 (2000) (Admissibility of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with Miranda warnings.).  No ground on which defendant's statements should suppressed has been presented to the court, and the motion is due to be denied in this regard.

## Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress be DENIED. It is further

ORDERED that defendant's motion for leave to file motion outside of time (Doc. #41) is GRANTED, and defendant's motion to admit CD with audio recording and offer of

proof (Doc. # 40) is DENIED.[8]

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before close of business October 27, 2005.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th  Cir. 1982).  *See also Bonner v. City of*

---

[8]  The CD in question contains a recording of a traffic hearing in the Prattville Municipal Court at which Lt. Barlow testified.  Defendant's motion indicates that Barlow testified at this hearing "that Defendant was stopped at a red traffic signal and made a right hand turn without giving a turn signal.  Furthermore, Barlow never testified that another vehicle was stopped in front of the defendant at the red traffic signal."  Motion to Admit CD at 2-3.  This evidence is cumulative.  At the second suppression hearing in this case, Barlow was asked the following question concerning the traffic hearing: "[I]n describing the circumstances leading up to the violation you omitted any reference to a car – number one, to a car being in front of Mr. Davis' car, and then number two, ... him turning right across these lines right here; isn't that correct?"  Barlow responded: "If you say so, yes, sir."  Accordingly, the court has assumed for purposes of its analysis that Barlow did not mention the car that was in front of Davis at the red light in previous testimony.  However, the court credits Barlow's explanation that he does not recall being asked whether there was a car in front of Davis, and that if he had been asked about it specifically, he would have testified to it.

*Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done, this 14th day of October, 2005.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE